IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DIGANGI PLUMBING COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 06 C 4770 |
| | ) |
| JAMES T. SULLIVAN, not individually but | ) |
| as Trustee of: PLUMBERS' PENSION FUND, | ) |
| LOCAL 130 U.A.; PLUMBERS' WELFARE | ) |
| FUND, LOCAL 130 U.A.; THE TRUST FUND | ) |
| FOR APPRENTICE AND JOURNEYMEN | ) |
| EDUCATION AND TRAINING, LOCAL | ) |
| 130, U.A.; and U.A. GROUP LEGAL | ) |
| SERVICES PLAN FUND, and as | ) |
| Co-Chairman of: THE JOINT | ) |
| ARBITRATION BOARD OF THE | ) |
| PLUMBING CONTRACTORS' | ) |
| ASSOCIATION OF CHICAGO AND COOK | ) |
| COUNTY AND CHICAGO JOURNEYMEN | ) |
| PLUMBERS' PENSION FUND, LOCAL | ) |
| 130 U.A., PLUMBERS' WELFARE FUND, | ) |
| LOCAL 130 U.A., THE TRUST FUND | ) |
| FOR APPRENTICE AND JOURNEYMEN | ) |
| EDUCATION AND TRAINING LOCAL | ) |
| 130, U.A., U.A. GROUP LEGAL SERVICES | ) |
| PLAN FUND, CHICAGO JOURNEYMEN | ) |
| PLUMBERS' LOCAL UNION 130, U.A., | ) |
| PLUMBING COUNCIL OF CHICAGOLAND, | ) |
| and JOINT ARBITRATION BOARD OF THE | ) |
| PLUMBING CONTRACTORS' | ) |
| ASSOCIATION OF CHICAGO AND COOK | ) |
| COUNTY AND CHICAGO JOURNEYMEN | ) |
| PLUMBERS' LOCAL UNION 130, U.A., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

This case concerns whether an arbitration decision and award, entered against Digangi Plumbing Company on June 7, 2006, should be enforced. Digangi is a member of the Plumbing Contractors Association of Chicago and Cook County (Association). The Association entered into a series of collective bargaining agreements (CBAs) with Chicago Journeymen Plumbers Local Union, 130, U.A. (Union). Under the CBA, Digangi agreed to make contributions on behalf of employees covered by the CBA to the Plumbers' Pension Fund, the Plumbers' Welfare Fund, the Trust Fund for Apprentice and Journeymen Education and Training, the Group Legal Services Plan Fund, and the Plumbing Council (along with the Union, collectively defined herein as the "Funds"). The CBA established a Joint Arbitration Board (JAB) to resolve all disputes by final and binding arbitration.

The JAB issued a decision adjudicating against Digangi a dispute it had with the Union regarding Digangi's contributions to the Funds. Digangi filed suit to challenge the JAB's decision. The Funds have counterclaimed to enforce the decision. The case is before the Court on cross-motions for summary judgment. For the following reasons, the Court enters judgment for the Funds enforcing the JAB's decision.

**Facts**

When Digangi entered into the CBA it agreed, among other things, that the Union would be the exclusive representative for Digangi's employees. The CBA also permits the Funds to conduct audits to verify an employer's compliance with the CBA's contribution requirements. The CBA requires employers to keep certain records, such as time cards and payroll records, so that the Funds can determine whether all required payments have been made.

In 2005, pursuant to the CBA, the Union commissioned an audit to determine whether

2

Digangi had complied with the CBA's contribution and reporting requirements from April 1, 1999 through March 31, 2004. DM Siegel, a certified public accounting firm, conducted the audit.

In July 2005, Suzanne Davey, a compliance auditor with DM Siegel, sent Digangi's Treasurer, Christine Consdorf, a letter notifying her of the preliminary audit results. Davey explained that Digangi's missing records, such as timecards, evidence of work performed, cash disbursements, and other items that the auditors had requested, more than likely would create a liability issue in the audit. Because of the missing records, the auditors tried to reconstruct the missing documents based on Digangi's W-2 forms, hourly pay rates, time sheets, and the contribution reports maintained by the Funds and the Union. Davey detailed the issues of concern identified by the audit and explained that a final liability letter would be issued in the coming months.

In October 2005, DM Siegel issued its final audit report. In the report, Dennis Siegel, a principal of DM Siegel, explained that the firm analyzed the records that were presented for inspection to determine compliance with the CBA's reporting requirements. Siegel concluded, among other things, that based on its review of the W-2s, time sheets, and the Funds' reports, there were thousands of unreported hours for work covered by the CBA for which Digangi had failed to pay:[1]

[T]he findings must conclude that *this contractor's records are severely deficient.*

---

[1] In Article I, the CBA outlines the jurisdictional area covered by the agreement. It includes the City of Chicago, Cook County, parts of Will County, parts of DuPage County, parts of Lake County as well as "wherever else the Union has territorial jurisdiction." Answer, Ex. 3, CBA § 1.2. The CBA requires the employer to make contributions to the Funds and to deduct Union dues. *Id*. §§ 6.1-6.2, 6.5-6.6, 6.8, 6.10.

> According to Ms. Consdorf, Thomas Digangi determines the nature of records maintained, as well as the extent of record retention; he reportedly disposed of many missing records required for the audit because he believes that record keeping is "not all that important for such a small company." Ms. Consdorf's expressed position is that she has no control over record keeping and that Mr. Digangi does what he wants. Neither owner Linda Digangi nor Thomas Digangi have responded to our correspondence, nor made themselves accessible during the entire audit process, apparently preferring to have the company's bookkeeper and corporate treasurer, Christine Consdorf, represent the contractor. . . .[T]he contractor has neither indicated agreement with, nor attempted to refute, these findings.

*See* Complaint, Ex. D (emphasis in original). Siegel also explained that pursuant to the audit, Digangi owed the Funds $306,529.63, including unpaid contributions, 8% liquidated damages under the CBA, and interest at 1.5% per month through 11/15/05. *Id*. at 4. Siegel attached schedules to the report showing in the detail the under-reported hours and computation of amounts he stated were due to the Funds.

Digangi disagreed with the audit report and disputed it before the JAB. Sections 3.1 and 3.2 of the CBA provide that all disagreements or disputes arising under the CBA are to be settled by arbitration before the JAB. The JAB consists of ten members, five appointed by the Association and five by the Union. Under Section 3.3 of the CBA, all unresolved disagreements regarding compliance with contribution audits are referred to the JAB as disputes arising under the CBA. *See* Answer, Ex. 3, CBA § 3.3.

On March 29, 2006, the JAB conducted an arbitration hearing to address Digangi's compliance with the CBA. Digangi participated in the hearing and presented its arguments and evidence to the JAB. Thomas Digangi, the company's president, testified at the arbitration hearing. Siegel also testified regarding the audit process and findings. The following colloquy

4

took place at the hearing:[2]

> Mr. Digangi:  Well, I don't know what it is that you want me to tell you, why don't you explain why I owe this money on the audit.
>
> Mr. Perillo:  Okay, Mr. Siegel, will you explain your findings to the Board.
>
> Mr. Siegel:  We went to Digangi's Company to conduct our audit. . . . We started the audit in Lake Geneva, Wisconsin in Mr. Digangi's garage with his bookkeeper Christine Consdorf. We never had any contact with Mrs. Digangi, the owner of Digangi Plumbing. We had very, very limited records to work with and after numerous requests, we were able to get something. We had to return on several occasions to try to get them done and each time we returned to a different location and always having the same problem, very limited documents to use. We could never find anything for Desert Springs or Mattioli & Sons. We have it as a disbursement without any other information to follow. We have four (4) Metal Trades members without any time records showing what they do. We picked up Tom Digangi on the 40 hours. He has a plumbers license and paid salary, we picked up all his hours.
>
> Mr. Digangi:  I'm the owner of Digangi Plumbing.
>
> Mr. Siegel:  Your corporate records that you provided showed your wife as 100% owner.
>
> Mr. Digangi:  I thought you said you didn't get these records.
>
> Mr. Siegel:  I said your records were very limited and incomplete.
>
> Mr. Digangi:  Well, whatever is missing, I know we have and we can get it for you.
>
> Mr. Franc[i]s:  You were supposed to have already gotten this stuff to them.
>
> Mr. Perillo:  Did you get the letter requesting an audit and confirmation for the audit to begin?

---

[2] Those present at the hearing representing the Association included: Terrence Perillo, Owen Francis, Ed Pientka, Steve Weinberg, and Larry Juliano. Those present at the hearing representing the Union included: James Coyne, Robert Walsh, Thomas McManus, Lawrence Wesensten. These members comprise the JAB. *See* Digangi Resp. to Funds Amended Additional Statement of Facts, Ex. A.

Mr. Digangi:   Of course I did, how else would I have gotten the audit done.

Mr. Perillo:   Those letter specifically list all of [sic] all the documents, records, time sheets, check records and invoices etc, that will be needed to conduct an audit, you know what they needed.

Mr. Digangi:   I gave them what they needed.

Mr. Siegel:    No, you did not. We had to try to re-construct hours after seeing union reports and W-2s that did not match up to conclude if proper hours were reported, W-2s when divided by hourly rates showed for more hours worked than reported.

Mr. Digangi:   We gave you everything we had. We had moved a couple of times during this audit, we have more. What about the letters I gave you about me not working?

Mr. Lindsay:   They were reviewed.

Mr. Siegel:    Your gross sales still show that you have more than 1 to 2 plumbers working.

Mr. Digangi:   I have more than that, I have 6 to 8 working.

Mr. Franc[i]s: Only 2 are plumbers[,] that means we have 6 guys doing our work and not getting benefit paid to the funds, it just doesn't work that way.

Mr. Siegel:    We were requesting records on and off for over a year and now they are available. Is that my understanding?

Mr. Digangi:   Yes.

Mr. Lindsay:   Why didn't you get them to Dennis Siegel after we had our meeting?

Mr. Digangi:   I don't know, I got too busy.

Mr. Pientka:   You got too busy; your audit is over $300,000.00. . . . That should have been your most important concern.

Mr. Franc[i]s: What kind of work do you do?

Mr. Digangi:   We do housing, custom housing, condos and town homes, very high end stuff.

Mr. Pientka: Okay, I'll give you that, so your material when it comes to fixtures may be a little more money, but copper is copper and P.V.C. and cast all cost the same. Where ever it's getting installed, it not only cost[s] the same, it takes the same amount of time for our men to install it.

Mr. Frances: Mr. Digangi, you're not showing enough men to install 3.1 million dollars of plumbing per year.

Mr. Coyne: It shows that you have four (4) Metal Trades and no apprentices. You can't have that, you only show two (2) Journeymen.

Mr. Franc[i]s: Are your Metal Trades men doing plumbing?

Mr. Digangi: Not all the time.

Mr. Walsh: There [sic] not supposed to be doing it any of the time.

Mr. Siegel: During the audit, we did see one (1) #501 member and one (1) # 93 member for a short period of time.

Mr. Digangi: I've had more plumbers than that. I've had 8 to 10 plumbers.

Mr. Siegel: You've had 8 to 10 plumbers over the audit period, you never had 8 to 10 plumbers at one time.

Mr. Digangi: Yes, I did, I can show you.

Mr. Siegel: The Union Report that we provide, the PR0490 is what we go off of.

Mr. Coyne: We make it off of what you send us.

Mr. Digangi: You have members in the audit that you say I didn't pay on, I paid on all my guys.

Mr. Pientka: The report shows you paid on hours, it just shows there are more hours due than what you paid.

Mr. Siegel: We got those hours by working with the W2s and PRO490s. W2s showed more hours worked, so we averaged it out per month.

Mr. Perillo: Are there any other questions?

Mr. Digangi: You're saying I didn't have all the records, I got this stuff for the auditors to see, I even asked him to come see it in my letter.

7

> Mr. Walsh: Tom, what you have here now is, you were suppose to get all this documentation and records to the auditor before we meet at the Joint Arbitration Board. The Board can decide to give it back to Dennis, but you will have to pay for his time.
>
> Mr. Lindsay: You can have your accountant perform an audit and give us a report if you want to.
>
> Mr. Digangi: I can do that.
>
> Mr. Walsh: When can you get it to us?
>
> Mr. Lindsay: Can you have it by May 15, 2006?
>
> Mr. Digangi: Yes, no problem.
>
> Mr. Lindsay: At that time, the Board can review his findings and check with D.M. Siegel to see what they show.

Digangi Resp. to Funds' Amended Additional Statement of Facts, Ex. A.1.

In the present suit, Digangi has submitted to the Court a report that his accountant drafted in response to the JAB hearing.[3] *Id*. The report does not purport to be an audit but rather appears to be an explanation of Digangi's record-keeping practices. The report also states that Thomas Digangi managed the business and did not work as a plumber.

On June 7, 2006, the JAB rendered its decision and found that Digangi had violated the CBA. The JAB required Digangi to pay $306,529.63 to Funds, which included liquidated damages and interest owing on the contributions up to that date. Digangi has yet to pay the amounts required by the award.

On September 1, 2006, Digangi filed in this Court a petition to vacate and/or modify the

---

[3] Thomas Digangi attests that he sent the JAB this report on or about May 13, 2006. *See* Digangi Resp. to Funds' Amended Additional Statement of Facts, Ex. B.

award. Digangi contends that the JAB's decision was not based on the CBA and should be vacated. On December 18, 2006, Funds filed a counterclaim seeking to confirm and enforce the award. Both parties have moved for summary judgment.

## Discussion

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A genuine issue of material fact exists only where the evidence would permit a reasonable fact finder to return a verdict for the nonmoving party. When reviewing cross-motions for summary judgment, a court must "construe all inferences in favor of the party against whom the motion under consideration is made." *Kort v. Diversified Collection Services, Inc.*, 394 F.3d 530, 536 (7th Cir. 2005) (internal quotations and citations omitted). The summary judgment "standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

The key question for the Court is whether the JAB's decision and award is based on the CBA. Digangi argues that the JAB's award is not based on the CBA because, it claims, the JAB simply adopted the audit findings and certain purported presumptions made by the auditors that Digangi argues were not grounded in facts. Specifically, Digangi contends that the JAB erred by presuming that certain Digangi employees performed work covered by the CBA and that

9

Digangi did not accurately report this work to the Union. It also argues that the JAB failed to interpret and apply a significant contract term. Digangi also contends that the Funds waived any claims regarding the M-6 metal workers that Digangi employed. Finally, Digangi argues that the decision and award violates the Labor Management Relations Act (LMRA) and the Employee Retirement Income Security Act (ERISA).

### 1. The JAB's interpretation of the CBA

Like many other things in life, entering into an agreement to arbitrate disputes involves trade-offs. On the plus side, the parties to such an agreement may gain the benefit of a specialized tribunal that understands "the customs and lore of an industry first-hand." *Dean v. Sullivan*, 118 F.3d 1170, 1173 (7th Cir. 1997). They also may gain the possibility of resolving their dispute at lower expense than litigation in court often entails. On the flip side, however, the parties to an agreement to arbitrate "lose . . . the right to seek redress from the courts for all but the most exceptional errors . . . ." *Id.*

Accordingly, when a court reviews an arbitration award, in particular a labor arbitration award like this one, its review is limited in scope. *See United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36 (1987). A court is not authorized to reconsider the merits of the dispute, even if a party alleges that the arbitrators' decision rests on factual errors or contractual misinterpretation. *Id.*; *see also, e.g., Bavrati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704, 706 (7th Cir. 1994) ("Judicial review of arbitration awards is tightly limited; perhaps it ought not be called 'review' at all."). If a court could reexamine the merits of the dispute, it would undermine the federal policy favoring settlement by arbitration of labor-related disputes. *See Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596 (1960).

10

A court is required to uphold a labor arbitrator's decision if it "'draws its essence from the collective bargaining agreement' and is not merely the arbitrator's 'own brand of industrial justice.'" *CUNA Mut. Ins. Soc'y v. Office and Prof'l Employees Int'l Union, Local 39*, 443 F.3d 556, 561 (7th Cir. 2006) (citation omitted). An arbitration award fails to draw its essence from the CBA only if the arbitrators based their decision on some body of thought, feeling, policy, or law outside the contract. *Id.* By contrast, an alleged error of contractual interpretation does not authorize overturning an arbitration decision. So long as the arbitrators actually interpreted the contract, their decision must be upheld. *Id.* at 561-62. Any doubts regarding whether an arbitration award drew its essence from the CBA are resolved in favor of enforcing the award. *Id.; see also Polk Bros., Inc. v. Chicago Truck Drivers Union*, 973 F.2d 593, 597 (7th Cir. 1992).

According to Digangi, the JAB simply adopted the auditor's findings, presuming them to be correct, and thus relied on a presumption not contained in the CBA. The Court disagrees. First, the CBA specifically contemplates that the process of resolving a dispute over employer contributions will begin with an audit. Section 3.3 of the CBA permits the Funds to conduct audits and establishes a dispute resolution procedure that governs when an employer disagrees with an auditor's findings. If, at the conclusion of that procedure, the matter is not resolved, the matter is to be determined by the JAB. The CBA specifically provides that "[n]o records or other evidence, including witnesses, which the Employer has not produced for the accountants" conducting the audit will be considered by the JAB, and that the JAB's consideration of the matter will not be delayed by the Employer's belated production of such evidence. *See* Answer, Ex. 3, CBA § 3.3. The Court sees nothing in the CBA that precludes the JAB from considering the findings resulting from an audit; indeed, the CBA at least implicitly contemplates that those

11

findings will be considered at a proceeding before the JAB.

Second, the outcome of the arbitration was, in significant part, the direct result of Digangi's failure to live up to its obligations under the CBA to maintain records and to provide them to the auditor in a timely fashion. Because Digangi's records were inadequate, the auditor attempted to reconstruct what had occurred by comparing Digangi's W-2 forms with its contribution reports. In doing so, the auditor drew inferences from the evidence it had obtained.

Third, the record of the arbitration hearing, part of which the Court quoted earlier, reflects that the JAB did not blindly rely on the auditor's report. Instead, it considered, and rejected, Digangi's contentions and its challenges to the auditor's findings. Among other things, the JAB drew inferences from the evidence and, in some instances, from the absence of documentation. Though reasonable minds might differ regarding the reasonableness of certain of those inferences, that does not mean that they are based on something other than an interpretation of the contract. The right to have a dispute determined by the JAB is not a right to have the JAB rule in the employer's favor or to reject an auditor's report out of hand.

In short, nothing in the record suggests that the JAB shirked its obligations or relied on any body of thought, feeling, policy, or law outside the CBA. To put it another way, the Court cannot conclude that Digangi has shown that "there is no possible interpretive route to the [arbitrator's] award, so a non-contractual basis can be inferred." *CUNA*, 443 F.3d at 562 (internal quotation marks and citation omitted).

Digangi's petition to vacate the arbitration decision amounts to a request to reweigh the evidence that was presented to the JAB. This the Court cannot do. Judicial review of an arbitration award "does not license a federal judge to consider the disputants' arguments afresh."

*Dean*, 118 F.3d at 1171. Given the outcome of the arbitration, it is unsurprising that Digangi wants to start over from scratch. But as the Seventh Circuit has stated, "if final and binding arbitration is to serve its purpose, it must be just that – final and binding. Arbitration would otherwise become little more than a procedural detour, without ultimate significance." *Id. See generally Sullivan v. Lemoncello*, 36 F.3d 676, 682-84 (7th Cir. 1994) (discussing limited scope of review of arbitration decisions).

### 2. The JAB's alleged failure to address a significant contract term

Digangi next argues that the JAB failed to address a critical provision in the CBA, specifically, section 3.3, which states that "[a]ction will be brought before the Joint Arbitration Board when any audit reveals that a licensed journeyman plumber and/or apprentice or any other party who performs jurisdictional work has not been paid the prevailing rate." Digangi relies on *Boise Cascade Corp. v. Paper Allied-Indus., Chemical and Energy Workers*, 309 F.3d 1075, 1081-82 (8th Cir. 2002), in which the Eighth Circuit affirmed a district court's decision to vacate an arbitration award, finding that the arbitrator had failed to discuss a probative contract term and that his award thus did not draw its essence from the parties' agreement.

Digangi argues that the JAB failed to address the term "reveals" in section 3.3. Its argument seems to be that because the JAB did not discuss all of the auditor's findings in detail and did not expressly reexamine these findings it cannot be said that the audit "revealed" that someone did jurisdictional work and was not paid the prevailing rate.

The Court disagrees. A party cannot expect, nor is it entitled, to receive a detailed decision from an arbitrator like it might receive from a court. *See United Steelworkers*, 363 U.S. at 598 ("[a]rbitrators have no obligation to the court to give their reasons for an award."). *See*

*also Lefkovitz v. Wagner*, 395 F.3d 773, 780 (7th Cir. 2005) ("Arbitrators are not professional judges; often they are not lawyers at all . . . . Parties that opt for arbitration trade the formalities of the judicial process for the expertise and expedition associated with arbitration . . ."). In any event, to the extent that the JAB relied on the audit, it did so only after considering and rejecting Digangi's contentions. Under the circumstances, Digangi has not shown that the JAB's failure to discuss the term "reveals" indicates that it failed to consider a probative contract term.

### 3. Contributions for M-6 Metal Tradesmen

Digangi also argues that the Funds waived or forfeited any claim for contributions on Digangi's use of M-6 metal tradesmen because the Union referred metal tradesmen, rather than journeymen or apprentice plumbers, to perform plumbing work.

Upon a review of the record, the Court cannot find, nor does Digangi indicate, where it raised this concern with the JAB. The law is well-established that failure to present an issue before an arbitrator forfeits the issue in an enforcement proceeding. *Nat'l Wrecking Co. v. Int'l Brotherhood of Teamsters, Local 731*, 990 F.2d 957, 960, 967 (7th Cir. 1992) ("parties . . . cannot stand by during arbitration, withholding certain arguments, then upon losing the arbitration, raise such arguments in federal court.").

Even were Digangi permitted to raise a forfeited argument, the Seventh Circuit has previously rejected contentions that a union's conduct bars a benefit fund from enforcing a CBA. In *Central States, Southeast & Southwest Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1153-55 (7th Cir. 1989) (*en banc*), the court acknowledged that unions and funds may have different interests and held that union actions, including even explicit representations by union representatives that all required benefit contributions would not be collected, could not

14

defeat the claims of a benefit fund. *Id*.

The Funds point out that the CBA precludes metal tradesmen from performing jurisdictional plumbing work. *See* Answer, Ex. 3, CBA § 4.8. As a party to the agreement, Digangi agreed to this. Digangi attempts to define the problem away by engaging in circular logic–that is, by claiming that any worker with a M-6 metal trades union-issued card was, by definition, doing non-jurisdictional work under CBA § 4.8. But under the CBA, an M-6 metal trades worker performing a plumbing job is indeed performing jurisdictional work, regardless of his or her title. In addition, Digangi has admitted that it used M-6 metal trades workers to perform plumbing work, which is a violation of § 4.8. *See* Digangi Resp. to Funds Amended Additional Statement of Facts, Ex. A.1. The JAB is empowered under the CBA to fashion remedies, including fines, for any breach of the agreement. *See* Answer, Ex. 3, CBA at § 3.6.

### 4. The JAB's award as it relates to the LMRA and ERISA

Finally, Digangi argues that the JAB's decision and award is contrary to public policy and violates the LMRA, 29 U.S.C. § 186(a), as well as ERISA, 29 U.S.C. § 1145. Specifically, Digangi claims that under section 186, an employer may not make a payment to any employee representative unless the payment qualifies for an exception. *See* 29 U.S.C. § 186(a) & (c). Digangi concedes that section 186(c)(5) permits employer payments to trust funds in certain instances. It argues, however, that this section would not permit the payment of fines or contributions for unidentified workers' hours to the employer trust funds, as Digangi argues was ordered by the JAB, because such employer payments are permitted only if "the detailed basis on which such payments are to be made is specified in a written agreement with the employer." 29 U.S.C. § 186(c)(5). Under the cited provision of ERISA, an employer is required to make

agreements under a multi-employer plan "to the extent not inconsistent with law." 29 U.S.C. § 1145. Digangi contends that requiring it to pay contributions for unidentified workers' hours is inconsistent with the law.

As the Funds point out, however, the LMRA specifically exempts court judgments and arbitration awards from the restrictions of section 186. Specifically, section 186 provides that

> [t]he provisions of this section shall not be applicable . . . (2) with respect to the payment or delivery of any money or other thing of value in satisfaction of a judgment of any court or a decision or award of an arbitrator or impartial chairman or in compromise, adjustment, settlement, or release of any claim, complaint, grievance, or dispute in the absence of fraud or duress.

LMRA, 29 U.S.C. § 186(c)(2). In addition, to the extent that section 186(c)(5) may require a detailed basis for calculation of contributions, Article IX of the CBA sets forth detailed guidelines. *See* Answer, Ex. 3, CBA § 9. Moreover, the language of the CBA specifically authorizes the JAB to include fines and other remedies that it determines to be appropriate. *Id*. § 3.6.

The Seventh Circuit has previously addressed penalties assessed by a JAB in similar context. In *Lemoncello*, which involved a previous incarnation of the CBA at issue in this case, the court stated that "the very purpose of arbitration is to bridge gaps in contractual language including the lack of a clearly defined 'objective basis' in the collective bargaining agreement defining the circumstances for awarding fines, penalties and interest." *Lemoncello*, 36 F.3d at 683. It therefore held that arbitrators are given wide latitude in fashioning appropriate remedies. *Id.* Finally, as the Funds point out, ERISA itself provides for the award of interest and penalties on amounts owed for contributions to funds. *See* 29 U.S.C. § 1132(g)(2). As a result, the Court cannot say that the penalties and fines assessed in this case are either unusual or against public

policy.

### 5. Local Rule 56.1 dispute

The Court briefly addresses the spat that has developed between the parties regarding their Local Rule 56.1 statements. Each side vociferously argues that the other has improperly raised certain issues in its submissions and Digangi contends that several disputed issues of fact exist from the underlying record.

Under Local Rule 56.1(a)(3), a movant must submit a statement of undisputed material facts that, according to the movant, entitles that party to judgment as a matter of law. At summary judgment, the existence of some alleged factual dispute between the parties will not defeat a motion for summary judgment. The Court's task is to determine whether there are *genuine* issues of *material* fact; immaterial factual squabbles are of no consequence. *See Anderson*, 477 U.S. at 247-48. The Court notes that "the purpose of the [Rule] 56.1 statement is to identify for the Court the evidence supporting a party's factual assertions in an organized manner: it is not intended as a forum for factual or legal argument." *Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000). As a result, to the extent that either party has made factual and legal arguments in their Rule 56.1 statements, the Court has disregarded them. Perhaps just as importantly, though Digangi's claims of error have come dressed as factual disputes, the disputes it highlights are not genuine issues of material fact under the standard of review that governs review of arbitration decisions.

## Conclusion

For the reasons discussed above, the Court grants defendant's motion for summary judgment [docket no. 54] and denies plaintiff's motion for summary judgment [docket no. 34].

The Clerk is directed to enter judgment in favor of the defendants.

Date: July 18, 2007

_____
MATTHEW F. KENNELLY
United States District Judge